**TRAFALGAR INVESTMENTS, LTD., Appellant,**

v.

**WESTMINSTER ASSOCIATES, LTD., Appellee.**

No. 14629.

Court of Appeals of Texas, Austin.

July 23, 1986.

Rehearing Denied Sept. 24, 1986.

Larry M. Lesh, Michael L. Jones, Locke, Purnell, Boren, Laney & Neely, Dallas, Paul J. Van Osselaer, Shapiro, Edens & Cook, Austin, for appellant.

John J. McKetta, III, Graves, Dougherty, Hearon & Moody, Austin, for appellee.

Before SHANNON, C.J., and EARL W. SMITH and GAMMAGE, JJ.

SHANNON, Chief Justice.

Appellee Westminster Associates, Ltd., filed a declaratory judgment suit in the district court of Travis County seeking a declaration of its rights and obligations concerning its indebtedness to appellant Trafalgar Investments, Ltd., as evidenced by a promissory note and deed of trust to certain apartment property in Austin. Ancillary to its declaratory judgment suit, Westminster sought a temporary injunction prohibiting Trafalgar from foreclosing on the apartment property pending trial on the merits. After hearing, the district court signed an order granting the temporary injunction.

Trafalgar posted notice to foreclose on the apartment property because Westminster had failed to make a note-payment. Westminster claims that, under the circumstances and the provisions of the Trafalgar note, it was excused from making the payment.

Trafalgar's promissory note is one part of a complicated "wrap-around" financial arrangement which involves several notes, secured by several deeds of trust on the apartment property, along with several other legal commitments between a number of parties who have been involved with the apartment property over the past two decades.

As this Court understands, "wrap-around" financing works as follows. A sells real property to B and receives in return a promissory note secured by a lien on the property. Some time later, B sells the property to C for a greater sum. B receives, in return, a promissory note which "wraps" the outstanding principal on the first note. In other words, the new note is for the outstanding principal on the first note, plus the equity which B has in the property. In conjunction with the new note, B takes a subordinate lien on the property. In the new note, B covenants to continue making payments on the first note out of the payments B now receives from C under the new note. The new note also allows C to step in and make the payments on the first note should B default, for which payments C receives a credit against the debt it owes to B. This provision is crucial to allow C to protect its interest in the property which is still subject to a lien securing the first note.

The following is a summary of the wrap-around arrangement financing the property concerned in this appeal. In 1969, Nash Phillips and Clyde Copus executed a promissory note for $2.4 million, secured by a deed of trust on the apartment property. Thereafter, Penn Mutual Life Insurance Co. purchased the note. In 1975, Penn Mutual purchased from Phillips and Copus an option to accelerate the due date on the note to November 1, 1985.

In 1978, Phillips and Copus sold the apartment property to another company, receiving a $2.7 million promissory note in

return. This note wrapped the outstanding principal on the Penn Mutual note. Phillips and Copus received a lien on the apartment property in conjunction with the second note.

In 1980, Trafalgar bought the apartment property, still subject to the two liens. In the same year, Trafalgar sold the complex to another company (TSL), and received in return a promissory note for $4.365 million, which note wrapped the outstanding principal on the prior notes. Trafalgar's equity in the property, approximately $1.7 million, was defined in the note as the "first principal," which was due to be paid in full on November 12, 1985. In conjunction with this note, Trafalgar received a lien on the property which is the lien Trafalgar was attempting to foreclose when Westminster filed suit. The provisions of this third note (the "Trafalgar note") control the resolution of this appeal and will be discussed later in more detail.

In 1983, TSL sold Westminster the property, which remained subject to the three liens. Westminster took several steps to attempt to protect its interest in the property at this point. First, Westminster entered into an escrow agreement with TSL which set aside a sum of money toward payment of the balance on the Penn Mutual note which would come due November 1, 1985. The escrow agreement also gives Westminster all of TSL's rights under the Trafalgar note. As a second step to protect the property, Westminster obtained two "estoppel letters" from Penn Mutual, whereby Penn, for consideration, promised that it would not alter the terms of the Penn Mutual note without Westminster's consent. Penn Mutual also represented that it would not change the due date of its note to any date later than November 1, 1985.

As November 1, 1985, approached, the parties began maneuvering about trying to determine who was responsible for payment of the Penn Mutual note. The facts are disputed regarding the extent to which various parties (especially Trafalgar and Phillips and Copus) repudiated the debt or expressed an intent not to make the payment. It should be noted that the Penn Mutual note and the Phillips and Copus note were non-recourse notes which meant that in the event of default the payee could look only to the collateral (the apartment property) for the funds that were due.

On October 21, 1985, Penn Mutual accepted, for consideration, Phillips' and Copus' offer to extend the due date on the Penn Mutual note for thirty days to November 30, 1985. Penn Mutual's agreement to extend was clearly in contravention of the estoppel letter agreements it had entered into with Westminster.

Westminster, contending that the thirty-day extension was invalid and that no one intended to pay the nearly $2 million due on the Penn Mutual note, stepped in and paid off the Penn Mutual note on November 1, 1985. Westminster then claimed a credit against Trafalgar under the terms of the Trafalgar note. Westminster claimed that this credit satisfied the November 12 payment it owed Trafalgar under the Trafalgar note, so that Westminster was not obligated to make, and did not make, the payment on November 12, 1985. When Trafalgar sent notice of its intention to foreclose on the apartment property, Westminster filed its declaratory judgment suit, requesting ancillary injunctive relief.

 In a hearing on an application for temporary injunction, the only question before the trial court is the right of the applicant to the preservation of the *status quo* of the subject matter of the suit, pending a final trial on the merits. To warrant the issuance of a temporary injunction the applicant need only show a probable right and a probable injury; he is not required to establish that he will finally prevail in the litigation. Where the pleadings and the evidence present a case of probable right and probable injury, the trial court is clothed with broad discretion in determining whether to issue the writ of injunction and its order will be reversed only on a showing of a clear abuse of discretion. *Davis v. Huey*, 571 S.W.2d 859 (Tex.1978);

*Transport Co. of Texas v. Robertson Transports,* 261 S.W.2d 549 (Tex.1953).

The parties' dispute centers upon Westminster's claim of a probable right to pay off the Penn Mutual note and claim of right to credit that sum against its obligation to Trafalgar. Undoubtedly, Westminster will suffer injury if Trafalgar is permitted to foreclose on the apartment property.

The crucial provisions of the Trafalgar promissory note are contained in Part 5 of the note, entitled "Obligations of Payee," which provide as follows:

> Payee [Trafalgar] covenants and agrees that Payee will (a) pay or cause to be paid all amounts ... due on the Underlying Note prior to the due date thereof; (b) cure any monetary default under the Underlying Note ... If Payee defaults in performance of its covenants and agreements contained in this paragraph, Maker shall be entitled, from and after the date of such default until the Maturity Date, (1) to pay any amounts due on the Underlying Note directly to the holder thereof, and Maker shall be entitled to and shall receive a credit on this Note in the amount of one hundred ten percent
>
> ...

Part 4 of the Trafalgar note, entitled "All-Inclusive Provision," defines "Underlying Note" somewhat ambiguously as the 1978 Phillips and Copus note, which "includes the unpaid principal balance of the following described promissory note (the "Penn Mutual Note") and the Underlying Note and the Underlying Deed of Trust include within their terms and are subject to the following: [description of the Penn Mutual note]." Hence, the Underlying Note is defined as the 1978 Phillips and Copus note, which includes within its terms the Penn Mutual note. The parties join issue on the extent to which the provision quoted above from Part 5 applies to the Penn Mutual note (*i.e.* the extent to which the term "Underlying Note" includes the Penn Mutual note.)

Resolution of this appeal hinges upon whether or not Phillips and Copus were in default on the Penn Mutual note. If, indeed, Phillips and Copus were in default on the Penn Mutual note, then Westminster probably had authority under the Trafalgar note to pay off the Penn Mutual note and receive credit on its obligation to Trafalgar. If, however, Phillips and Copus were not in default, then Westminster had no authority to step in and pay off the Penn Mutual note. Whether or not Phillips and Copus were in default depends, in turn, upon the treatment accorded the so-called "estoppel letters" obtained by Westminster from Penn Mutual.

At or about the time Westminster purchased the apartment property, it obtained the following "estoppel letters" from Penn Mutual:

> Oct. 31, 1983
>
> ...
>
> ... Penn hereby represents and warrants as follows:
>
> ...
>
> 13. So long as Penn is the owner/holder of the Note and Deed of Trust, Penn will not allow the Note, Deed of Trust or any other documents relating thereto to be modified or amended without purchaser's consent.
>
> ...
>
> Sincerely,
>
> THE PENN MUTUAL LIFE INSURANCE COMPANY
> /s/ William H. Warwick
> Nov. 23, 1983
>
> ...
>
> This shall confirm that pursuant to Paragraph 10 of the First Modification Penn Mutual must exercise its option to accelerate the Note on or before November 1, 1985. If Penn Mutual does not exercise such option on or before November 1, 1985, the provisions of Paragraph 10 of the First Modification shall become inoperative.
>
> ...
>
> /s/ William H. Warwick

As previously written, Penn Mutual granted Phillips and Copus a thirty-day extension on the November 1 payment, in

plain contravention of Penn Mutual's estoppel letter representations to Westminster. If the estoppel letters had the effect of invalidating the thirty-day extension, then the record probably supports the conclusion that Phillips and Copus defaulted on the November 1 payment. In other words, the extension itself would be an anticipatory breach by Phillips and Copus if it were ineffective to extend the November 1 deadline. If, however, the estoppel letters did not invalidate the extension, then Phillips and Copus had another month to make the payment and there was no default.

■ The parties have furnished no authority nor have we discovered any which would support the conclusion that the estoppel letters invalidated the thirty-day extension without legal action by Westminster against Penn Mutual. Parties to a note, after all, may agree to extend the term of the note without the joinder or consent of subsequent purchasers or lienors. *Texas Land and Mortgage Co. v. Cohen*, 138 Tex. 464, 159 S.W.2d 859 (1942). Although Westminster could have sued Penn Mutual for specific performance of the estoppel letters, it did not do so. Instead, Westminster chose to unilaterally declare the thirty-day extension invalid and make the November 1 payment, thereby hoping to avail itself of the credit provision of the note.

■ Because the extension was not attacked and judicially invalidated, there probably was no default of the Penn Mutual note on November 1 when Westminster stepped in and paid off the note. Accordingly, Westminster was probably not entitled to a credit under the terms of the Trafalgar note, and it probably defaulted on that note when it failed to make the November 12 payment to Trafalgar.

Because this Court has determined that Westminster failed to present a case of probable right, we have concluded that the district court abused its discretion in granting the temporary injunction.

The order of the district court is reversed and the temporary injunction is dissolved.